IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2020 Session

**STATE OF TENNESSEE v. JAY AARON JACKSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-B-1249     Steve R. Dozier, Judge**
_____

**No. M2019-01128-CCA-R3-CD**
_____

Defendant, Jay Aaron Jackson, was convicted by a Davidson County jury of one count of coercion of a witness, two counts of domestic assault, and one count of domestic assault by extremely offensive or provocative physical contact. The trial court sentenced Defendant, as a Range II multiple offender, to an effective sentence of seven years, eleven months, and twenty-nine days' incarceration. On appeal, Defendant asserts that: (1) the trial court erred in denying his motion to dismiss the indictment based on a violation of Rule 16 of the Tennessee Rules of Criminal Procedure and *Brady v. Maryland*; (2) the trial court erred by permitting the State to elicit impermissible and prejudicial evidence in violation of Rule 404(b) of the Tennessee Rules of Evidence; (3) the evidence was insufficient to support Defendant's convictions for coercion of a witness and one count of domestic assault; (4) the trial court erred in sentencing Defendant as a Range II multiple offender; and (5) the trial court erred by instructing the jury on flight. Following a thorough review, we affirm the convictions for coercion of a witness (Count 1), domestic assault (Count 3), and domestic assault by extremely offensive or provocative physical contact (Count 4) and reverse the conviction for domestic assault (Count 2). Because the sentence in Count 2 was ordered to be served concurrently with Count 1, we affirm the effective sentence of seven years, eleven months, and twenty-nine days' incarceration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ (on appeal); Martesha L. Johnson (at trial), District Public Defender; and Mary Ruth Pate and Dave Kieley (at trial), Assistant District Public Defenders, for the appellant, Jay Aaron Jackson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

*Indictment*

In May 2017, the Davidson County Grand Jury issued an indictment charging Defendant with the following offenses:

| Count | Offense | Date | Classification | Victim |
|-------|---------|------|----------------|--------|
| 1 | Coercion of a Witness | 8/29/16 | Class D Felony | Sara Jackson |
| 2 | Domestic Assault | 8/29/16 | Class A Misdemeanor | Sara Jackson |
| 3 | Domestic Assault | 7/17/16 | Class A Misdemeanor | Sara Jackson |
| 4 | Domestic Assault | 7/17/16 | Class A Misdemeanor | C.J.[1] |

*Pretrial Motions*

Rule 404(b)

Prior to trial, Defendant filed a motion in limine pursuant to Tennessee Rule of Evidence 404(b), asserting that all witnesses should be prohibited from referring to a portion of an alleged threat Defendant made to his then-wife, Sara Jackson. Specifically, Defendant requested that the trial court exclude evidence that Defendant told Ms. Jackson that he "had been in jail and he knew people who could" place a bomb in her car. Defendant further asserted that witnesses should be prohibited from mentioning Defendant's pending charges in Cheatham County. In a separate motion in limine, Defendant requested that the trial court exclude evidence regarding his pending charges in Transylvania County, North Carolina, arguing that evidence of "other pending charges stemming from an incident that occurred prior to the offense date of this indictment [was] irrelevant to any question of [Defendant's] guilt or innocence" and was not admissible under Rules 401, 402, 403, and 404(b) of the Tennessee Rules of Evidence.

---

[1] It is the policy of this court to refer to minors by their initials.

At a hearing held before the start of Defendant's trial, defense counsel argued:

> Your Honor, our position is that . . . all the State would need to have is the actual threat to place a bomb in the car, the follow-up statement that [Defendant] had been in jail and knew people who could do this is not necessary to prove the State's elements of coercion. He's already made the threat.

The State submitted that it did not intend to introduce evidence regarding Defendant's pending charges in Cheatham County but that Defendant's reference to having been in jail and to knowing people who could help him was an important part of the threat he made to Ms. Jackson.

The trial court granted Defendant's motion to exclude evidence regarding his charges in North Carolina. However, the trial court denied Defendant's motion regarding Defendant's reference to having been in jail. The trial court reasoned:

> I can't sit here and pick and choose what the jury might find important in terms of proving the State's allegations in [C]ount [1]. So if that is occurring at the same time, it's not a prior bad act. It just goes to Ms. Jackson's perception in terms of whether this allegation that the State has brought in [C]ount [1] . . . could, and from her perspective would actually be carried out.

> So -- I can't sanitize [D]efendant's statements just because they put them in some bad light. But they are not even going to hear any information as to whether that's true or not. The important thing is in terms of me deciding, but would the jury find . . . [that] she's feeling like he's pretty serious about this and claiming he knows people that do it. So -- but again, that's the jury's role in terms of deciding what they believe was said or evaluating testimony. But I don't think that falls in any kind of 404(b) situation.

### Motion to Dismiss

Defendant also filed a motion to dismiss the indictment prior to trial. A copy of the motion to dismiss is not included in the appellate record. However, at the pretrial hearing, the trial court stated, "Now, I have before me a motion to dismiss for *Brady* violations." Defense counsel then explained that the basis of the motion was three jailhouse phone calls that the defense "came into possession of last week[.]" He stated that two of the calls were from September 2017 and that one call was from January 2018.

- 3 -

Defense counsel said, "Last week as I was doing my preparation because I came onto this case late, I noticed something that I thought we needed to review the [jailhouse phone calls]." Counsel acknowledged that the defense was able to "get [the jailhouse phone calls] from the sheriff's department." Defense counsel argued:

> For the *Brady* analysis, we just need to prove that there is something potentially exculpatory and material to the defense. I think the statement that I included in the motion is clearly that.

> The woman that we believe is [Ms.] Jackson says they've gotten an innocent man in jail, talks about mental health issues, drug issues, talks about being threaten[ed] by the DA's office.

> . . . .

> Those statements are all arguably a form of recantation and otherwise would go to credibility. And whether or not [the prosecutor] or anyone who was working on this case with him had possession of that is also not relevant of this case law because [the sheriff's department] is a state actor. And so *Brady* requires the State affirmatively seek out exculpatory material.

Defense counsel explained that the jail call from January 2018 was "with the woman we believe to be [Defendant's daughter]."

The prosecutor stated that he did not know about any jailhouse phone calls until he received Defendant's motion to dismiss the night before trial, and defense counsel acknowledged that the prosecutor was unaware of the jailhouse phone calls prior to his filing the motion to dismiss. The prosecutor explained to the court that jailhouse phone calls "are equally available to both sides[.]"

The trial court questioned defense counsel, "[H]ow are you prejudiced since you now have them and potentially can cross examine the . . . witnesses about the statements?" Defense counsel responded, "It's the timing." Counsel acknowledged that, "even if we got [the jailhouse phone calls] late, we could still maybe use that to impeach [the witnesses]" but explained:

> It raises multiple issues of the testimony. It raises issues with potentially getting mental health records. It raises issues where she makes this statement about her ex-husband telling her to say things, which involves another potential defense witness who we wouldn't have even

- 4 -

thought to interview[] until we heard that statement. So we never had the opportunity to try to track that guy down, to try to interview him about that.

The trial court then asked if Defendant wanted a continuance, but defense counsel responded that he did not. The prosecutor asserted:

> Further, [defense counsel] and I had a conversation back in the fall, I've got specific notes about it, where Ms. Jackson and [defense counsel] had a conversation and Ms. Jackson was referencing a lot of this stuff that's referenced in this motion. So . . . they were very aware of from a very early time in this case. I can't help it that they decided to pull [jailhouse phone] calls, a week, two weeks ago[.]"

Reading from his file notes, the prosecutor said, "October 5th, 2017, [defense counsel] advises me that Ms. Jackson advised her that this did not happen. That she was not a willing prosecutor[,] that she had panic attack[s] and PTSD[,] and she was previous[ly] married. Those were my notes from that October 5th, 2017, conversation." Defense counsel then agreed that the defense was aware of the information referenced in the prosecutor's notes in October 2017 and acknowledged that the defense did not seek a subpoena for Ms. Jackson's medical records thereafter.

The trial court denied Defendant's motion to dismiss at the conclusion of the hearing. The trial court found that Defendant failed to establish that it was Ms. Jackson and Defendant's daughter, C. J., speaking with him in the jailhouse phone calls, that the jailhouse phone calls were available to the defense and were in the possession of the defense prior to trial, and that Defendant failed to show that the sheriff's department knew of the contents of the jailhouse phone calls. The court reasoned:

> I've not gotten proof here today that the sheriff's department reviews any [jailhouse phone] calls at all. I know they are recorded and some people listen to them and some don't, in terms of [prosecutors] and now defense attorneys do as well if you discover them. But there is no information that I have here today that anyone with the sheriff's department reviewed them to just blanketly say the District Attorney's [O]ffice is responsible for knowing any and everything that may be exculpatory from tens of thousands of [jailhouse phone] calls in any and every case is beyond what I contemplate as [a] *Brady* situation.
>
> . . . .

Secondly, the defense is now aware of it, doesn't want a continuance. Can go here in a few minutes and speak with Ms. Jackson further about these phone calls. And I don't know how -- maybe it isn't her, maybe somebody is on the phone with -- [Defendant]?

. . . .

Maybe somebody is on the phone with [Defendant] imitating Ms. Jackson or the daughter. So you are aware of it. Don't want a continuance. I don't think there has been a *Brady* violation, so I will deny this motion.

### *Trial*

At trial, Sara Jackson testified that she first married Defendant in June 1994. Ms. Jackson explained that they divorced in November 2004 but remarried in September 2015. Ms. Jackson said that she divorced Defendant for the second time in February 2018. She explained that she had four children with Defendant. She said that, after divorcing Defendant the first time, she married Frederick DeCotten, and they had one child together. She and Mr. DeCotten divorced in 2010.

Ms. Jackson recalled that, on the evening of July 16, 2016, she, Defendant, and their son, F.J., spent the night on some property she purchased in Cheatham County. She testified that, in the early afternoon of the following day, they went to visit Defendant's mother, who lived in an apartment at Trevecca Towers in Nashville. She said that Defendant drove them to Nashville in their Chevrolet Astro van. Ms. Jackson explained that she wanted to go to Trevecca Towers because two of her children with Defendant and her child with Mr. DeCotten were there. She explained that her daughter, C.J., had driven herself and the other children to Trevecca Towers the previous day in Ms. Jackson's Chevrolet Cruze.

Ms. Jackson testified that, before they left for Nashville, Defendant "took meth with a needle." She stated:

I was trying to be as sweet and nice and calm as possible because I -- [F.J.] and I wanted so badly to get to Trevecca so we could get the other children. And we -- I didn't have a plan that we knew exact, but we had planned on -- I had my keys and a little money, then a food card in my purse there. And my hopes [were] that we were going to get into the car and leave without telling him and go back to Indiana[,] [where Ms. Jackson was originally from].

- 6 -

She stated that she did not tell Defendant that she wanted to leave because he would not let her leave. She explained that her keys, some cash, and EBT food card were at Trevecca Towers, where she had hidden the items from Defendant. Ms. Jackson stated that, during the drive to Nashville, she tried to be "amicable" and "happy" but that Defendant got mad and "squeez[ed] her wrist[.]" She recalled that she was sitting in the back seat with F.J. at the time. When Defendant squeezed her wrist, she "started screaming[,]" and F.J. held her hand and said, "It's okay, mom, it's okay."

When they arrived at Trevecca Towers, Ms. Jackson ran into the apartment. Ms. Jackson recalled that, when she got inside the apartment, she told her children, "[G]uys, guys, we got to make it quick, we got to get my purse. If [Defendant] comes up here, don't tell him where it is. Do not give it to him, whatever you do, please don't give it to him." Ms. Jackson testified that, when Defendant entered the apartment, he knew "something was up." Ms. Jackson stated that C.J. was holding her purse, and Defendant "started running after her" and then began "running after [Ms. Jackson]." Ms. Jackson explained that Defendant lunged at her, grabbed her wrist, and "bumped" her in the chest where she had been injured previously. She said that she was "scared to death" and that it "hurt a lot." She explained that Defendant was over six feet tall, weighed about 200 pounds, and was "[r]eally in shape." Ms. Jackson, however, was five feet, two inches tall and weighed just over 100 pounds.

Ms. Jackson testified that C.J. tried to "grab [Defendant] off of [her]." Defendant then pushed C.J., grabbed Ms. Jackson's purse, and "took off" because C.J. ran downstairs to call the police. Ms. Jackson explained that her purse contained her cell phone and the EBT card and that Defendant left the apartment complex in her Chevrolet Cruze. She said that, soon after Defendant left, officers and a paramedic arrived at the scene. Based on what Ms. Jackson told the officers, warrants were taken out against Defendant. Ms. Jackson stated that she also obtained an order of protection against Defendant.

Ms. Jackson testified that she and her children returned to Defendant's mother's residence, and they stayed with her for several nights. Ms. Jackson said that she called Defendant on his cell phone and "begged" him to return her car. At that time, Defendant demanded to know if Ms. Jackson had filed a police report. When she told Defendant that there were outstanding warrants against him based on the assault, he said, "You drop those charges, or I will kill you." Ms. Jackson recalled that Defendant dropped off her car a day or two later and took the van.

Ms. Jackson explained that Mr. DeCotten paid for a hotel room where she and the children stayed for several nights after leaving Trevecca Towers. Ms. Jackson recalled that, while in the hotel lobby, a woman named Melanie noticed Ms. Jackson's injuries

and asked her about them. Ms. Jackson explained what had happened, and Melanie said, "I tell you what, why don't you come stay with us for a couple of weeks, we will see if we can get you guys on your feet . . . we live in Alabama." Ms. Jackson stated that she and the children stayed in Alabama with Melanie for two weeks. She testified that, when school was about to start, Melanie got them a hotel room so that they could return to Tennessee.

Ms. Jackson acknowledged that she talked to Defendant by phone when she returned to Tennessee. Ms. Jackson explained that, when she spoke to him, Defendant "adamantly" wanted her to "drop the charges." He advised her not to come to court and "came up with all kinds of scenarios [about] what to say." Ms. Jackson stated that Defendant made it clear that this was what she had to do, and she believed him.

She explained that Defendant worked as a landscape architect and that one of his clients was a couple that lived in Bellevue. Defendant gave Ms. Jackson their phone number, and Ms. Jackson eventually met with the couple. She recalled:

> They wanted to help us. And they said, you can come and live -- they had a really big house. And they said, "you can come and live with us on our third floor," so that you can get the school -- the kids on the first day of school, we can -- you know we will figure things out as it goes. But we can give them their normalcy, keep them in school, not have any changes in that regard.

Ms. Jackson recalled that, late on August 28 or early on August 29, 2016, she spoke to Defendant on her cell phone while she was sitting in her Chevrolet Cruze. Defendant told Ms. Jackson that, if she "didn't drop the charges, he would kill her." Defendant said, "I've been in jail and . . . the worst thing you can do is mess with someone's time[.]" Defendant threatened to put a bomb in her car and said that either he would do it or that he would get another inmate to "do [a] trade[.]" Ms. Jackson testified that she believed Defendant would do as he threatened. Ms. Jackson testified that, later in the day on August 29, she and C.J. were in the car driving to a store when they heard "something underneath the car[.]" Ms. Jackson continued:

> I just was convinced at that moment there was [a] bomb underneath my car, I didn't know. And I told [C.J.] and she said mom, we got to call the police. And so we called the police, we waited, we waited and they came and we asked them to please just look at the car and they did.

Ms. Jackson explained that officers took out new warrants for Defendant after this incident.

- 8 -

On cross-examination, Ms. Jackson said that, before going to Nashville on July 17, Defendant told her he took methamphetamine that morning. The following colloquy took place:

Q. That's fine. So at this point you're upset because [Defendant's] using methamphetamine, but you also don't drive his car, so knowing that he had just used these illegal drugs, you still chose to let him drive you and your son to Nashville?

A. Because he had just attacked me and I was petrified. I was petrified, I wasn't thinking clearly.

Q. He attacked you before you left . . . that morning?

A. Yes, ma'am.

. . . .

[A.] He hit me in my eye so hard that I had, for about two weeks, a super black eye. He hit me here so hard that it popped this bone out and he chipped my tooth.

Ms. Jackson denied that she tripped and fell while running into the apartment at Trevecca Towers. Ms. Jackson recalled that, when Defendant entered the apartment, he was "like a lunatic" and "scary." Ms. Jackson agreed that Defendant became so upset that he grabbed her wrist and side and pushed her in the chest, causing her pain. She said that when C.J. ran out of the apartment looking for a phone to call police, Defendant fled the apartment complex in Ms. Jackson's car. When the police arrived, they offered to take Ms. Jackson to a shelter, but she refused. Ms. Jackson explained, "I declined it because my children have been through so much trauma."

Ms. Jackson agreed that, after taking out the order of protection, she continued to speak to Defendant over the phone. She said that Defendant called her, and she called him. She stated that, by August 28-29, 2016, the order of protection had been granted. She agreed that she continued to have communication with Defendant after August 29, when she took out new charges against him. She stated, "He called me from time to time and I called him from time to time." She agreed that she called Defendant on her birthday, and he suggested that she come to North Carolina to see him. He bought her a plane ticket, and she visited him there. She returned to North Carolina for Thanksgiving with their children. She stated that she went to North Carolina because she "always had that hope." She testified, "I wanted so badly to have that family. And he had this control

over me, it's really hard to explain, especially now that I've been away from him for so long, it's hard for me to understand that person too."

Ms. Jackson said that Defendant injured her chest using the palm of his hand. She said that, when Defendant hit her in the chest again at Trevecca Towers, "it just hurt it so much more." She recalled that, when officers arrived at Trevecca Towers, they saw her eye. She explained that the prior assault happened in Cheatham County; the officers said that "they wanted to help [her] with that but they said it's not their jurisdiction[.]"

F.J. testified that he was seventeen years old and that Defendant was his father and Ms. Jackson was his mother. He testified that, in July 2016, his parents owned some property in Cheatham County. He said that there was a dilapidated shack on the property that Defendant was attempting to repair. F.J. said that he spent the night at the property on the evening of July 16, 2016, with his parents. He recalled that Defendant became "upset" with Ms. Jackson that night. He stated, "[Defendant] made like a motion towards [Ms. Jackson], [and] I got in between. I wasn't touched or anything like that, although [Defendant] was definitely intent on like, you know, straightening my mother up, I suppose you could say." He stated that he urged Defendant to "calm down."

F.J. testified that he slept in the van that night, while Defendant and Ms. Jackson slept in the shack. He recalled that they drove to Trevecca Towers in Nashville the following day. He said that, as Defendant drove the van, he seemed to grow "more and more belligerent" towards Ms. Jackson. Defendant became aggressive towards Ms. Jackson, started to yell at her, and squeezed her hand. F.J. testified that Ms. Jackson became distressed, and he tried to comfort her. He said that, as soon as they arrived at Trevecca Towers, Ms. Jackson ran out of the van and into the apartment. A few minutes later, Defendant "rushed in the door" of the apartment and began looking for the keys to the Chevrolet Cruze and the EBT card. F.J. testified that his sister, C.J., stood in Defendant's way, and Defendant shoved her. C.J. then tried to grab Defendant's leg, but he "kicked her off" and continued to the bedroom where Ms. Jackson was located. Ms. Jackson ran out of the bedroom and lay down on an air mattress in the living area of the apartment. F.J. stated that "[Defendant] ran out and he was grabbing her. [Defendant] wanted to find the food card and keys." He said that Defendant shook Ms. Jackson and demanded to know where the car keys and EBT card were located. F.J. said that C.J. eventually gave Defendant the car keys and the EBT card so that Defendant would not further "harass" Ms. Jackson. He recalled that C.J. called the police but that Defendant left the scene before police arrived. He explained that, because Defendant took Ms. Jackson's car, they spent the night at Trevecca Towers.

On cross-examination, F.J. explained that they went to the property in Cheatham County because Defendant wanted to show them the repairs that Defendant had made to

the building on the property. F.J. recalled that he was sitting in the back seat of the van and that Ms. Jackson sat in the front with Defendant during the drive to Nashville. He recalled that Ms. Jackson was "extremely distressed" and was crying. He said that she "almost jumped out of the van on the interstate." He denied seeing Ms. Jackson fall when she got out of the van at Trevecca Towers. He described the incident inside the apartment as "scary."

C.J. testified that she was eighteen years old and was the daughter of Ms. Jackson and Defendant. She explained that her grandmother lived at Trevecca Towers and that she spent the night at her grandmother's apartment on July 16, 2016. Regarding the next day, C.J. stated:

> [A]round noon, [Ms. Jackson] frantically came into the apartment nervous, scared. She was hiding our credit cards, money, food card, car keys, and said keep these safe, hidden. Moments after, [Defendant] comes in, storms in, yelling, tearing the apartment apart trying to look for the keys, credit cards and started to attack [Ms. Jackson].

> And I was really scared for [Ms. Jackson] because she said to not give him the belongings, but [Defendant] was really hurting her and she couldn't defend herself. So I tried getting him off of her and failed to do so, so I gave him the credit cards and phone and -- credit cards and the car keys and he took them and then I went downstairs and called the police.

C.J. testified that Defendant was on top of Ms. Jackson and that, when C.J. tried to help her mom, Defendant pushed C.J. C.J. then tried to grab Defendant's leg, but he "kicked [her] off of his leg." C.J. testified that she felt nervous and scared during the entire incident. She said that there was no phone in the apartment, so she went downstairs and borrowed a phone to call the police. C.J. stated that, before the police arrived, Defendant left the scene, taking Ms. Jackson's Chevrolet Cruze. After speaking to police, she accompanied Ms. Jackson downtown to take out a warrant against Defendant. She recalled that Ms. Jackson had a "bruised and kind of red mark on her eye[.]"

C.J. recalled that she and her siblings stayed with Ms. Jackson in a few hotels before going to stay in Alabama for a couple of weeks. When they returned to Tennessee, they stayed at a "bed-and-breakfast-type house," where they "helped around the house" in exchange for a place to stay. She said that, between July 17, 2016, and August 29, 2016, she did not see Defendant. She recalled that, on August 29, she and Ms. Jackson were in Ms. Jackson's Chevrolet Cruze. As they pulled into a store parking lot, they heard an odd noise coming from the car. C.J. said that "it sounded like there

were rocks or something in the car." She recalled that Ms. Jackson was "really scared and said that she was scared that someone had done something to the car[.]" Ms. Jackson called the police, and when officers arrived, they checked the car but did not find anything.

On cross-examination, C.J. said that Defendant was "enraged" when he entered her grandmother's apartment on July 17. She said that it was her idea to call the police and denied that Ms. Jackson told her to do so. She agreed that she had contact with Defendant after the incident and that she eventually went to North Carolina to be with Defendant, along with her siblings and Ms. Jackson. She agreed that she had spoken with Defendant one time since his arrest on the instant charges.

Office David Smith with the Metro-Nashville Police Department (MNPD) testified that he responded to Trevecca Towers on July 17, 2016, around 1:00 p.m. Once there, he spoke to Ms. Jackson, whom he described as "extremely frantic" and "[v]ery emotional." Officer Smith said that Defendant left the scene before his arrival. Officer Smith stated that, after speaking with Ms. Jackson and C.J., he accompanied them to night court in order to take out a warrant against Defendant. He recalled seeing a large prominent bruise under Ms. Jackson's left eye. Officer Smith testified, however, that this bruise was not the basis for the current charges, and he did not notice any additional injuries to Ms. Jackson.

Officer Doug Atwood of the MNPD testified that he responded to a call made by Ms. Jackson on August 29, 2016. When he arrived at the store parking lot, Officer Atwood spoke to Ms. Jackson and C.J. Ms. Jackson told Officer Atwood that she received a call from Defendant and that he threatened her during the call. According to Ms. Jackson, Defendant "threatened to put a bomb on her car if certain things were not done to his satisfaction." Ms. Jackson told Officer Atwood that Defendant had two outstanding warrants for his arrest but that he was currently out of the state. Officer Atwood and his sergeant looked at the exterior of Ms. Jackson's Chevrolet Cruze and did not see anything out of the ordinary on the car.

Following deliberations, the jury found Defendant guilty of one count of coercion of a witness, two counts of domestic assault, and one count of domestic assault with physical contact.

### *Sentencing*

At a sentencing hearing, the State introduced the presentence report into evidence. Justin Bell testified that he worked as a detective in the narcotics task force at the Transylvania County Sheriff's Office in Transylvania County, North Carolina. Detective

Bell stated that Defendant currently had the following charges pending in North Carolina: possession of methamphetamine, possession of precursors necessary to manufacture methamphetamine, and larceny.

Ms. Jackson testified that she and her children had previously seen Defendant making methamphetamine, both in Tennessee and in Indiana. She explained the lasting damage Defendant's physical and mental abuse had on her and their children. Ms. Jackson asked that the trial court sentence Defendant "to the maximum."

On cross-examination, Ms. Jackson acknowledged that, after Defendant's arrest, she wrote him a letter while he was in custody awaiting trial. She agreed that, in the letter, she gave Defendant the impression that she was "going to get back with him[.]" She explained that this was because she was afraid of Defendant and due to the physical and mental abuse she suffered. She stated that she had not written to Defendant or spoken to him on the phone since his trial.

Defendant made an allocution, in which he stated that he could comply with any conditions of probation set by the court. Defendant explained that, while incarcerated, he had attended many classes with the goal of bettering himself. He asked for leniency so that he could continue to work and to support his children and his mother. Defendant stated that he accepted responsibility for "the domestic violence and for the times that [he] should have been more supportive and less temperamental[.]" He further stated that, at least early in his incarceration, he had "amicable communications both written and by phone with [his] children and [Ms. Jackson]." He said that he had "always been there for [his] children" and that he "[stood] here knowing that [he was] one of the best dads on the planet."

During argument, the State contended that Defendant was a Range II offender based on his prior felony convictions as listed in its Notice of Enhanced Punishment filed prior to trial. When questioned by the trial court, defense counsel conceded that Defendant was a Range II offender. The trial court took the matter under advisement at the conclusion of the hearing. The court subsequently entered a written order sentencing Defendant, as a Range II multiple offender, to seven years for coercion of a witness in Count 1; eleven months and twenty-nine days for domestic assault in both Count 2 and Count 3; and six months for domestic assault with physical contact in Count 4. The trial court ordered Counts 1, 2, and 4 to run concurrently but Count 3 to run consecutively to Count 1, for a total effective sentence of seven years, eleven months and twenty-nine days to serve in the Tennessee Department of Correction.

Defendant filed a timely motion for new trial and an amended motion for new trial, which the trial court denied after a hearing. This timely appeal follows.

## II. Analysis

### *Motion to Dismiss Indictment*

Defendant contends that the trial court erred in denying his "motion to dismiss and [in failing to take] any remedial action based on multiple violations of Rule 16 [of the Tennessee Rules of Criminal Procedure] and *Brady v. Maryland*[.]" Defendant asserts that the State violated the requirements of *Brady* "and/or Rule 16" by failing to produce the recorded jailhouse phone calls between Defendant and Ms. Jackson that were in the possession of the Davidson County Sheriff's Office and contained exculpatory and favorable material for the defense.

The State responds that it had no duty to provide evidence that was equally available to Defendant and notes that federal courts have held that an inmate's custodian does not fall within the ambit of *Brady*. Finally, the State asserts that Defendant has not included the jailhouse phone calls in the record, thereby preventing a determination of whether the recordings were material.

### Rule 16

Initially, we conclude that, to the extent Defendant relies on Rule 16 of the Tennessee Rules of Criminal Procedure as a ground for relief, he has waived this issue. The motion to dismiss is not included in the record on appeal,[2] and it is otherwise unclear from the record whether Defendant included a violation of Rule 16 as a basis for the motion. Moreover, defense counsel's argument at the hearing was based solely on *Brady*.

It is well-settled that when a party seeks appellate review, it has a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling was presumed correct in the absence of an adequate record on appeal). Where the record is incomplete, an appellate court is precluded from considering the issue. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). This issue, therefore, has been waived.

---

[2] By failing to include a copy of the motion to dismiss in the record, Defendant also risked waiver of the *Brady* issue on this ground as well. However, we conclude that the transcript of the pretrial hearing adequately preserved Defendant's argument as it related to a *Brady* violation.

- 14 -

## *Brady v. Maryland*

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). "The prosecution is not required to disclose information that the accused already possesses or is able to obtain . . . or information which is not possessed by or under the control of the prosecution or another governmental agency." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing *State v. Caldwell*, 656 S.W.2d 864, 897 (Tenn. Crim. App. 1983) and *Banks v. State*, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). The defendant must prove, by a preponderance of the evidence, that a *Brady* violation has occurred. *Edgin*, 902 S.W.2d at 389.

In order to establish a *Brady* violation, the evidence need not be admissible; it only needs to be favorable to the defendant. *State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensible, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (internal quotation marks omitted). As the United States Supreme Court has recognized, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n. 12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). Evidence is material under *Brady* "only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A "reasonable

probability" is "a probability sufficient to undermine the confidence in the outcome." *Id.* (internal quotation marks omitted).

In this case, the trial court found that Defendant failed to establish that it was Ms. Jackson and C.J. speaking with him in the jailhouse phone calls. We agree. Defendant failed to authenticate and introduce into evidence the jailhouse phone calls at the pretrial motion hearing. Because they were not authenticated and are not included in the record on appeal, we are unable to conclude that the jailhouse phone calls were favorable to Defendant or to determine their materiality under *Brady*. Because the record is incomplete, we are precluded from considering the issue, *see Roberts*, 755 S.W.2d at 836, and we presume that the trial court's ruling was correct. *Oody*, 823 S.W.2d at 559.

Waiver notwithstanding, the trial court found that the jailhouse phone calls were equally available to the defense, and under *Brady*, the prosecution is not required to disclose information that a defendant already possesses or is able to obtain. *Marshall*, 845 S.W.2d at 233. Moreover, Defendant failed to demonstrate that the sheriff's department knew of the contents of his jailhouse phone calls. *See Strickler*, 527 U.S. at 275 n. 12. Finally, Defendant was in the possession of the evidence prior to trial. In the case of delayed disclosure of exculpatory evidence, a potential *Brady* violation may be cured by the defendant's failure to move for a continuance after receiving the information, the defendant's thorough cross-examination of the witness regarding the evidence, or by the defendant's failure to call or recall an available witness concerning the exculpatory statements. *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (citing *United States v. Ingraldi*, 793 F.2d 408 (1st Cir. 1986)). In this case, the trial court offered Defendant a continuance in order to cure any potential prejudice, but Defendant declined. He cannot now complain that he was prejudiced because of his own failure to take advantage of a method the trial court offered to correct the alleged *Brady* violation. For all these reasons, Defendant is not entitled to relief based on this claim.

### *Admission of Evidence*

Defendant asserts that the trial court erred by permitting the State to introduce "impermissible and prejudicial evidence in contravention [of] Tennessee Rule of Evidence 404(b)." Specifically, he argues that the trial court should have excluded, under Rule 404(b), evidence from Ms. Jackson relating to acts of abuse that took place while Defendant and Ms. Jackson were in the van on their way to Trevecca Towers on July 17, 2016; evidence of Defendant's drug use; evidence regarding Defendant's prior incarceration; and testimony from Ms. Jackson that "she felt her situation to be an ongoing abusive situation." Defendant asserts that this evidence "had little or no bearing on whether [Defendant] committed the charged offenses and could have easily been sanitized by the trial court . . . but the trial court elected not to do so[.]" He further

asserts that the trial court failed to follow the procedure outlined in Rule 404(b) before admitting the evidence and that the evidence "invited the jury to convict [Defendant] based on the assertion that he had abused Ms. Jackson both in the past and recently, so he must have committed the charged offenses."

The State responds that Defendant "failed to object to most of the complained-of evidence and, in fact, spent considerable time on cross-examination questioning Ms. Jackson about it." The State assets that most of Defendant's claims are waived, noting that Defendant did not raise most of his claims in his motion for new trial and that he does not make a plain error argument. Finally, the State responds, as to the single claim preserved for review, that the trial court properly found that the evidence was relevant and not unduly prejudicial.

### Waiver

Initially, we agree with the State that Defendant has waived all claims except for his claim that the trial court erred in admitting the portion of his statement to Ms. Jackson about his prior incarceration. In his motion for new trial, Defendant alleged:

> The Court erred in denying [Defendant's] Motion in Limine #3 to exclude a portion of an alleged threat made to [Ms. Jackson] on August 29, 2016. The part of [Defendant's] alleged bomb threat where he stated that he "had been in jail and he knew people who could do this" is a reference to prior bad acts and prior convictions and should have been excluded under Rule 404(b).

Defendant failed to include any of the additional claims he now raises under Rule 404(b) in his motion for new trial. As a result, Defendant has waived our consideration of those claims. Tenn. R. App. P. 3(e) (providing that in "all cases tried by a jury, no issue presented for review shall be predicated upon . . . [a] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). Moreover, Defendant does not argue that he is entitled to plain error relief on those claims. *See* Tenn. R. App. P. 36(b).

### Rule 404(b)

Rule 404(b) of the Tennessee Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the

character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). "In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background." *State v. Montgomery*, 350 S.W.3d 573, 583 (Tenn. Crim. App. 2011) (citing *Gilliland*, 22 S.W.3d at 272); *see also* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion" in ruling on the admissibility of the evidence. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a

- 18 -

trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

In this case, the trial court held a hearing prior to the start of Defendant's trial regarding his motion to exclude certain evidence under Rule 404(b). Defendant did not deny that he had been in jail previously or that he had mentioned his prior incarceration while speaking to Ms. Jackson on the phone on August 29, 2016. Rather, he argued that his "statement that [he] had been in jail and knew people who could [put a bomb in Ms. Jackson's car] [wa]s not necessary to prove the State's elements of coercion." In denying the motion to exclude Defendant's reference to his prior incarceration under Rule 404(b), the trial court found that the evidence went to "Ms. Jackson's perception in terms of whether this allegation that the State has brought in [C]ount [1] . . . could, and from her perspective would actually be carried out." We agree that Defendant's statement that he had been previously incarcerated and therefore knew people who could put a bomb in Ms. Jackson's car was an important part of the State's proof; it was highly probative of Defendant's intent to coerce Ms. Jackson to drop the charges against him (Count 1) and of whether Ms. Jackson's fear of Defendant's threat was reasonable (Count 2). Because the record does not clearly demonstrate that the trial court abused its discretion, Defendant is not entitled to relief. *See id.*

### *Sufficiency of the Evidence*

Defendant argues that the evidence adduced at trial was insufficient to support his convictions for coercion of a witness in Count 1 and for domestic assault in Count 2. Regarding Count 2, he contends that the State's proof "rested solely on the impeached testimony of a single witness" and that Defendant was never in the physical proximity of Ms. Jackson on August 29, 2016. Defendant asserts that Ms. Jackson was never in imminent fear of Defendant's threat of a bomb in her car "because he was never in her presence and there was no immediacy to the threat based on the phone call." Defendant notes that Ms. Jackson "elected to wait several hours and then drive her vehicle notwithstanding the alleged threat that was made," which he argues "further undercut[s] both the supposed imminence of the threat and her fear of [Defendant's] conduct." As for Defendant's conviction for coercion of a witness in Count 1, he argues that Ms. Jackson's testimony was "muddled and confused," and she was impeached on cross-examination. Defendant argues that there were no other parties to Defendant's phone

call, no recording of the call, and no proof from Ms. Jackson's cell phone to establish that the call at issue was made. The State responds that the evidence is sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Coercion of a Witness

As charged in this case, "[a] person commits an offense who, by means of coercion, influences or attempts to influence a witness or prospective witness in an official proceeding with intent to influence the witness to . . . [e]lude legal process summoning the witness to testify or supply evidence[.]" Tenn. Code Ann. § 39-16-507(a)(3) (2016). Further, "coercion" is statutorily defined as "a threat, however communicated, to . . . [c]ommit any offense." Tenn. Code Ann. § 39-11-106(a)(3)(A); *State v. Paul O. Dickens, Sr.*, No. M2005-00571-CCA-R3-CD, 2006 WL 359664, at *6 (Tenn. Crim. App. Feb. 15, 2006), *perm. app. denied* (Tenn. June 26, 2006).

When viewed in the light most favorable to the State, we conclude that the evidence was sufficient to support Defendant's conviction for coercion of a witness in Count 1. Following the domestic assault on July 17, 2016, police were called, and Ms. Jackson and C.J. took out warrants against Defendant. In a subsequent phone call, Ms. Jackson told Defendant about the outstanding warrants. Defendant "adamantly" wanted Ms. Jackson to "drop the charges"; he advised her not to come to court and "came up with all kinds of scenarios [about] what to say." Then, late in the evening on August 28

or early on August 29, 2016, Ms. Jackson spoke to Defendant while sitting in her car. During the call, Defendant threatened to kill Ms. Jackson by putting a bomb in her car if she did not "drop the charges." Defendant said that either he would do it or that he could get another inmate to "do [a] trade[.]" From this, the jury could reasonably infer that Defendant threatened to kill Ms. Jackson in an attempt to influence Ms. Jackson, as a prospective witness in the domestic assault case, to avoid testifying against him. Accordingly, we conclude that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. The evidence is sufficient to support Defendant's conviction for coercion of a witness.

## Domestic Assault

"A person commits domestic assault who commits an assault as defined in [Tennessee Code Annotated section] 39-13-101 against a domestic abuse victim." Tenn. Code Ann. § 39-13-111(b) (2016). As relevant here, "domestic abuse victim" means an adult who is a current or former spouse. Tenn. Code Ann. § 39-13-111(a)(1) (2016). A person commits an assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" Tenn. Code Ann. § 39-13-101(a)(2) (2016). "[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Tenn. Code Ann. § 39-11-106(a)(18) (2016). A person acts "knowingly" if that person acts with an awareness: (1) that his or her conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result. *See* Tenn. Code Ann. § 39-11-106(a)(20) (2016).

The Tennessee Supreme Court has previously quoted with approval the following definition of "imminent":

> Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening.

*State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (quoting BLACK'S LAW DICTIONARY 750 (6th ed. 1990)). Based upon this definition, the court explained that a person "must be placed in a reasonable probability of danger as opposed to a mere possibility of danger" for the threat of death or serious bodily injury to be "imminent" under the reckless endangerment statute. *Id.* (citing *State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)).

A conviction under the domestic assault statute, however, does not require that a defendant actually place another in imminent danger of serious bodily injury; instead the statute proscribes "causing another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2) (2016). In discussing the element of fear in the assault statute, this court has held that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury" and that "the apprehension of imminent bodily harm may be inferred from the conduct of the victim following the [alleged] assault." *State v. Christopher Carter*, No. W2006-02124-CCA-R3-CD, 2007 WL 3391385, at *5 (Tenn. Crim. App. Nov. 15, 2007) (quoting *State v. Gregory Whitfield*, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998), *perm. app denied* (Tenn. Dec. 7, 1998)), *perm. app denied* (Tenn. Apr. 7, 2008); *State v. Terrance Dixon*, No. W2011-01432-CCA-R3-CD, 2012 WL 1656721, at *6 (Tenn. Crim. App. May 10, 2012) (quoting *Gregory Whitfield*, 1998 WL 227776, at *2).

In this case, even when viewed in the light most favorable to the State, we cannot conclude that sufficient evidence was presented to prove beyond a reasonable doubt that Defendant is guilty of domestic assault in Count 2 because the State failed to establish that the victim reasonably feared *imminent* bodily injury. Ms. Jackson did not testify that she feared imminent bodily injury, and we are unable to infer that fear from her actions following Defendant's threat. Ms. Jackson testified that she was sitting in her car speaking to Defendant on the phone when Defendant threatened kill her by putting a bomb in her car if she did not drop the charges against him. Ms. Jackson did not call the police after this threat and, several hours later, drove herself and her daughter to a store in her car. *Cf. State v. Tommy Arwood, Jr.*, No. 01CO1-9505-CC-00159, 1996 WL 274996, at *3 (Tenn. Crim. App. May 24, 1996) (holding the evidence was sufficient to find the victim was fearful of imminent bodily injury when he attempted to defend himself and called police after the defendant left), *no perm. app. filed*. Because the proof does not show the essential element that the victim feared imminent bodily injury, we reverse Defendant's conviction for domestic assault in Count 2.[3]

### *Sentencing*

Defendant asserts that the trial court erred by finding that he was a Range II multiple offender. He argues that the State failed to present proof that the offenses the trial court relied on to find that he was a Range II offender were committed on different dates. Defendant contends that he is entitled to resentencing as a Range I standard

---

[3] Reversal of the conviction in Count 2 will not affect Defendant's total effective sentence because the trial court ordered the sentence for Count 2 to run concurrently with the sentence in Count 1, coercion of a witness.

- 22 -

offender. The State responds that the record supports the trial court's finding that Defendant is a Range II multiple offender.

Initially, we note that Defendant also asserts in the heading of this issue in his brief that the trial court erred in determining the length of his sentence and by imposing consecutive sentencing. However, Defendant makes no argument in support of these claims. Accordingly, these issues are waived for appellate review. See Tenn. Ct. Crim. App. R. 10(b).

A defendant may appeal from the length, range, manner of service, or consecutive alignment of a sentence imposed by the trial court. Tenn. Code Ann. § 40-35-401 (2018). On appeal, a defendant bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401 (2018), Sent'g Comm'n Cmts. When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

The standard of review applicable to the length of sentences adopted in *Bise* has now been applied to the trial court's determination of an offender's range classification. *State v. Laylon Ward, Jr.*, No. W2017-00736-CCA-R3-CD, 2018 WL 1091792, at *2 (Tenn. Crim. App. Feb. 23, 2018) (citing *State v. Joseph Cordell Brewer, III*, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *7-8 (Tenn. Crim. App. June 1, 2015)). Thus, if the trial court's determination that Defendant was a Range II multiple offender is supported by the record and reflects that the trial court properly applied the purposes and principles of sentencing, the trial court's decision is reviewed for an abuse of discretion, with a presumption of reasonableness. The State bears the burden of establishing beyond a reasonable doubt that the defendant possesses the requisite number of prior felonies to qualify for a particular range. *State v. Jones*, 901 S.W.2d 393, 397 (Tenn. Crim. App. 1995). Pursuant to Tennessee Code Annotated section 40-35-106(a)(1), to properly sentence Defendant as a Range II multiple offender for the Class D felony conviction for coercion of a witness, the State would have to prove beyond a reasonable doubt that Defendant had received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes[.]" Tenn. Code Ann. § 40-35-106(a)(1) (2018).

In this case, the presentence report indicates that Defendant was convicted of two counts of identity theft, a Class D felony, and one count of theft over $500, a Class E felony, in Williamson County Circuit Court on November 17, 2009. The presentence report reflects an offense date of October 7, 2008, for the identity theft convictions and November 5, 2008, for the theft conviction. Thus, the record supports the trial court's

determination that Defendant had at least two prior convictions "within the conviction class, a higher class, or within the next two (2) lower felony classes" and that Defendant was a Range II offender.

Defendant asserts on appeal that he committed the prior offenses within the same twenty-four-hour period and that, as such, his convictions fall under the merger rule and constitute one conviction for the purpose of determining prior convictions. *See* Tenn. Code Ann. § 40-35-106(b)(4) (2018). However, a criminal defendant has the burden of proving that his crimes were performed within a twenty-four-hour period so as to fall under the merger rule. *See State v. Kenneth Edward Watts*, No. E2010-00553-CCA-R3-CD, 2011 WL 5517000, at *7 (Tenn. Crim. App. Nov. 8, 2011); Tenn. Code Ann. § 40-35-106(b)(4). Not only did Defendant fail to establish that he committed the offenses within the same twenty-four-hour period, but he agreed with the State that he was a Range II offender at the sentencing hearing. Defendant has not established that the trial court abused its discretion in sentencing him as a Range II multiple offender. He is not entitled to relief.

### *Flight Instruction*

Finally, Defendant contends that the trial court erred when it erroneously granted the State's request to instruct the jury on flight when there was insufficient proof in the record to support such an instruction. Defendant argues that the State presented no proof to suggest that Defendant was hiding out or evading prosecution for his assaults on Ms. Jackson and C.J. The State responds that Defendant fled his mother's home in Nashville before police arrived and then went to North Carolina. It argues that the proof established that Defendant was concerned about being charged with assault, so much so that he threatened to kill Ms. Jackson if she continued prosecuting the case. Accordingly, the State argues that there was sufficient proof to find that Defendant left Tennessee to evade prosecution, and the trial court's flight instruction was not error.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). There is sufficient evidence to justify a flight instruction when the State has established "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." *State v. Whittenmeir*, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (internal quotation marks omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. *State v. Scotty Dale Staggs*, No. M2011-01675-CCA-R3-CD, 2013 WL 2722286, at *18 (Tenn. Crim. App. June 12, 2013) (citing *State v. Terrance Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim.

App. Nov. 22, 1999)).  This court has previously explained that "[t]he law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction." *Whittenmeir*, 725 S.W.2d at 688 (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)).  It is proper for the trial court to instruct the jury on flight when the issue has been raised by the proof.  *See State v. Kendricks*, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996).

Here, the trial court's instruction on flight was proper.  The proof at trial established that, on July 17, 2016, Defendant committed domestic assault against Ms. Jackson and C.J.  Ms. Jackson testified that, because C.J. ran downstairs to call the police, Defendant "took off" and fled the scene in Ms. Jackson's car.  After learning from Ms. Jackson that there were outstanding warrants for his arrest, Defendant left the state and went to North Carolina, where he was not arrested until May 2017.  This evidence supported the trial court's instruction on flight, and Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing, we reverse and dismiss Defendant's conviction for domestic assault in Count 2 but affirm the judgments of conviction in Counts 1, 3, and 4.

_____
ROBERT L. HOLLOWAY, JR., JUDGE